**Sherri HITE, Appellant–Plaintiff,**

v.

**Gregory HAASE, M.D., Haase and Coates Internal Medicine, P.C., Thomas Maddox, Executor of the Estate of Richard W. Cross, M.D. and Clinical Gynecology, Inc., Appellees–Defendants.**

No. 43A03–9810–CV–431.

Court of Appeals of Indiana.

May 16, 2000.

Terry Kaiser Park, Caplin Pehler Park & Tousley, P.C., Indianapolis, Indiana, Attorney for Appellant.

Milford M. Miller, Larry L. Barnard, Calvert S. Miller, Miller Carson Boxberger & Murphy, Fort Wayne, Indiana, Attorneys for Appellees Gregory Haase, D.O., and Haase and Coates, Internal Medicine, P.C.

Edward A. Chapleau, Chapleau & Kuehl, South Bend, Indiana, Attorney for Appellees Thomas Maddox, Executor of the Estate of Richard W. Cross, M.D. and Clinical Gynecology, Inc.

## OPINION

BROOK, Judge

### Case Summary

Appellant-plaintiff Sherri Hite ("Hite") appeals from a judgment entered after a jury trial. We affirm.

### Issues

Hite presents four issues, which we restate as follows:

I. whether the trial judge should have granted a mistrial, recused himself, or disclosed certain information;

II. whether the trial court abused its discretion by limiting the scope of an expert's testimony;

III. whether the trial court erred in striking interrogatories served one day before the discovery deadline; and,

IV. whether the trial court correctly granted partial judgment on the evidence to two of the defendants.

### Facts and Procedural History

In October of 1978, then twenty-two year old Hite first saw Richard Cross, M.D. ("Cross"), of Clinical Gynecology, Inc. ("CGI"). She complained of severe cramping, heavy bleeding, and problems with birth control pills. Although advised to return in one month for examination and removal of an intrauterine device, Hite did not see Cross again until October 29, 1991.

In March of 1988, Hite presented at the office of Gregory Haase, D.O. ("Haase"), of Haase and Coates Internal Medicine, P.C. ("HCIM") to establish herself as a patient, to have certain lipomas [1] examined, and to be treated for gastrointestinal symptoms. Hite reported a medical history that included a tubal ligation, a dilatation and curettage ("D & C"), peptic ulcer disease, mild gallbladder dysfunction, two pregnancies that resulted in live births, and occasional difficulty when swallowing.

Hite next visited Haase on January 8, 1990, this time complaining of chronic nausea, heartburn, and vomiting. A January 25, 1990 esophagogastroduodenoscopy [2] revealed that Hite had erosive esophagitis.[3] At a February 1991 visit to Haase, Hite continued to complain of hiccups, upper abdominal pain, occasional nausea, and discomfort. A February 1991 computerized axial tomography ("CT") scan [4] ordered by

---

1. A lipoma is "a benign tumor usually composed of mature fat cells." RICHARD SLOANE, THE SLOANE-DORLAND ANNOTATED MEDICAL-LEGAL DICTIONARY 418 (1987).

2. This procedure involves the insertion of a fiberoptic tube through the patient's mouth, into the esophagus, the stomach, and the duodenum in order to directly visualize these areas. 2 DAN J. TENNENHOUSE, ATTORNEYS MEDICAL DESKBOOK 3D § 10:15 (1993).

3. Esophagitis is defined as inflammation of the esophagus. SLOANE, *supra* at 264. "Erosive" indicates the presence of erosions, or lesions. *See* ROBERT BERKOW, M.D. & ANDREW J. FLETCHER, M.B., THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 763 (16th ed.1992).

4. "CT imaging involves taking x-rays from many different angles, feeding the image data into a computer, and generating a high resolution composite image from the computer." TENNENHOUSE, *supra* at § 14:1.

Haase showed Hite to have an enlarged uterus. A pelvic ultrasound performed the following month indicated a fibroid tumor in Hite's uterus.

On October 29, 1991, Hite saw Cross, complained of bleeding, and reported her previous sterilization and an ultrasound showing a two-centimeter fibroid tumor on her uterus. On January 22, 1992, Hite followed up with Cross, who advised her that she would need a hysteroscopy[5] and probably a D & C. Cross's notes also indicate that in February of 1992, Hite underwent a mammogram. Haase treated Hite for esophagitis in May of 1992. Although Hite called Cross's office in August of 1992 to schedule the hysteroscopy, she cancelled the procedure on September 1, 1992 because she was too busy at work. Haase treated Hite for heartburn in December of 1993.

In January of 1994, Hite returned to Cross, complained of breast pain and redness, and had a mammogram. On February 9, 1994, Hite presented with erratic and irregular periods with significant pain. Cross prescribed Ansaid and birth control pills. However, Hite took only two of the birth control pills because she said they caused nausea and vomiting. On April 5, 1994, Hite took a urine pregnancy test at Cross's office; the result was positive. Six days later, Hite contacted Cross's office, reported that her period had started, and asked if a sonar was still necessary. Although Cross recommended that she return for another pregnancy test after her period, Hite did not return for several months.

On August 11, 1994, Hite complained to Cross of severe cramping. Five days later, Hite underwent an ultrasound, which showed an enlarged uterus and a fibroid tumor. Cross diagnosed adenomyosis.[6]

On August 16, 1994, Hite told Cross that she was tired of the pain and bleeding, stated that she wished to proceed with a hysterectomy, signed a consent for the procedure, and checked "no" on a surgery health care profile which asked whether she could be pregnant. The hysterectomy was scheduled for September 13, 1994 with pre-operative testing to occur on September 9.

Hite contacted Haase on August 24, 1994, this time reporting flu-like symptoms, including headache, vomiting, and diarrhea. Haase prescribed various medications to relieve her symptoms. On August 30, 1994, Hite went to Kosciusko Community Hospital because she had been vomiting for a week and felt a tightness in her epigastric region. The emergency room physician, Linda Law, M.D. ("Law"), noted that Hite likened her symptoms to those she had experienced four years previously; that she was scheduled for a hysterectomy for endometriosis; that her periods were irregular; and that she had not had a period for two months. Law ordered an abdominal x-ray series, discussed the negative results with Haase, and recommended that Hite be admitted. When the series came up negative, Law discussed Hite's care with Haase, who then admitted her. During her hospital stay, Hite told Haase that she had undergone tubal ligation, that she was scheduled for a hysterectomy, and that she had vomited blood. Haase ordered an abdominal ultrasound and made sure she was rehydrated and received potassium and Zantac. On September 2, 1994, Haase discharged Hite from the hospital because her symptoms had resolved.

Three days later, Hite again presented to the hospital and explained that her

---

5. During a hysteroscopy, a "fiberoptic instrument is passed through the canal of the cervix into the uterus. The uterus is filled with an optically clear solution or with carbon dioxide gas, and the endometrial cavity of the uterus is visually examined." TENNENHOUSE, *supra* at § 10:16.

6. Adenomyosis is "a benign condition characterized by ingrowth of the endometrium into the uterine musculature, sometimes associated with an overgrowth of the latter." SLOANE, *supra* at 12.

symptoms had returned. Haase order a CT scan, which was performed on September 7, 1994. When the CT scan showed her uterus enlarged with evidence of retained fluid inside the uterine cavity, Hite was released and told to follow up with Cross, who was on vacation. On September 9, 1994, Hite arrived at the hospital for previously scheduled pre-hysterectomy tests, including a test for pregnancy. A positive result sent Hite to Cross's office, where an ultrasound confirmed the presence of a 29 millimeter fetus. Cross called the radiology department to determine how much radiation Hite had received, spoke with a radiologist who stated it was "significantly possible you've got teratogenicity[7] going on," relayed the information to Hite, suggested termination, and referred her to another doctor for a second opinion. The notes of the doctor who gave the second opinion provided:

> The patient states that because of her age and the fact that she was previously sterilized causing this to be an unwanted pregnancy to her. She's also extremely concerned about the fact that she was exposed to diagnosed radiation to her pelvis during the course of her workup. According to Dr. Cross and calculated by [the radiologist] the patient has been exposed to approximately 3 rads of radiatoni. This is in excess of the 1 rad radiation which is thought to be a safe level of exposure to a developing fetus. For that reason the patient is also concerned that there may be damage already to the fetus. Because of that she plans termination of pregnancy.

Hite had her pregnancy terminated on September 20, 1994, and was treated thereafter by Cross for infection. Trial testimony later revealed that generally speaking, the amount of radiation to which Hite was exposed would not have produced "statistically a greater risk" of birth defects to the child than ordinarily existed for mothers not exposed to radiation.

On December 14, 1995, Hite filed a malpractice complaint with the Indiana Department of Insurance. The Medical Review Panel (the "Panel") unanimously found that Haase, HCIM, Cross, and CGI had breached the applicable standard of care and that such conduct was a factor in Hite's injury. In July of 1997, Hite filed a complaint in Kosciusko Superior Court against Haase, HCIM, Cross, and CGI. She alleged that Haase had failed to timely diagnose her pregnancy, resulting in exposure of her fetus to diagnostic radiation during early gestation. She alleged that Cross failed to timely diagnose her pregnancy and then erroneously advised her to terminate her pregnancy due to the teratogenic effects of the radiation on the fetus. She claimed physical and emotional injuries as a result of the loss of her fetus and complications therefrom.

Judge Duane Huffer ("Judge Huffer") set a jury trial date of August 31, 1998. That summer, Cross died and his estate (the "Estate") was substituted as a party defendant. During the trial, Haase moved for and the trial court granted him partial judgment on the evidence. The jury ultimately found against Hite.

### Discussion and Decision

■ Before analyzing the case on the merits, we must address the Estate's motion to strike Hite's brief and dismiss her appeal due to what it asserts is impertinent, intemperate, scandalous, or vituperative language contained therein. Hite responds that she does not believe her counsel's statements were improper, that she meant no disrespect, and that she apologizes if she was overzealous.

■ "We have the plenary power to order a brief stricken from our files for the use of impertinent, intemperate, scandalous, or vituperative language on appeal impugning or disparaging this court, the

---

7. A teratogen is "an agent or factor that causes the production of physical defects in the developing embryo." SLOANE, *supra* at

711. Similarly, teratogenesis is the "production of physical defects in off-spring in utero." *Id.*

trial court, or opposing counsel." *Pitman v. Pitman*, 717 N.E.2d 627, 634 (Ind.Ct. App.1999). "Striking scandalous or impertinent material has been a part of Indiana practice since long before the adoption of our present trial rules." *B & L Appliances & Servs., Inc. v. McFerran*, 712 N.E.2d 1033, 1038 (Ind.Ct.App.1999).

We acknowledge the borderline nature of this case. In her brief, Hite strongly disapproves of the way in which Judge Huffer conducted this case. However, the nature of Hite's argument, that Judge Huffer should have disclosed his possible familial relationship with Nancy, an employee of Haase,[8] or recused himself, essentially requires some assertion of improper action. *See Moore v. Liggins*, 685 N.E.2d 57, 63 (Ind.Ct.App.1997) ("mere allegation of bias, without a specific factual showing in support, is insufficient to require disqualification."). The type of argument Hite makes does not excuse the tone used, but does explain it to some degree. Accordingly, we are not inclined to strike a portion of, let alone the entire, brief of Hite. We would simply caution counsel to word such an argument more carefully in the future.

## I. Disqualification, Recusal, or Mistrial

■ On September 3, 1998, the last day of trial, Hite called Bruce Harter ("Harter"), the man by whom she became pregnant, as a witness. Following Harter's testimony, Haase read into the record allegations that Harter had perjured himself and requested that the transcript be sent to the prosecutor's office. The court agreed to comply with the request. During the making of the record, Haase disclosed that in June of 1998, Harter had conversed with Nancy Huffer ("Nancy"), an employee of Haase, and that the discussion was promptly relayed to Haase and the Estate's counsel. Hite moved for a

mistrial, citing the recently discovered familial relationship between Judge Huffer and Nancy; Nancy is the widow of Judge Huffer's cousin. Judge Huffer denied her motion. On appeal, Hite argues that Judge Huffer should have granted a mistrial due to his failure to disqualify himself or to disclose his familial relationship with Nancy.

■ "A judge shall disqualify himself ... in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer or personal knowledge of disputed evidentiary facts concerning the proceeding[.]" Ind. Judicial Conduct Canon 3(E).

A judge is presumed by law to be unbiased and unprejudiced. To overcome this presumption, the party seeking to disqualify a judge must establish actual personal bias. A mere allegation of bias, without a specific factual showing in support, is insufficient to require disqualification. Adverse rulings are insufficient to show bias per se. Upon review of a judge's failure to recuse, we will assume that the judge would have complied with the obligation to withdraw had there been any reasonable question concerning impartiality, unless we discern circumstances which support a contrary conclusion.

*Moore*, 685 N.E.2d at 63 (citations omitted); *see also Leisure v. Leisure*, 589 N.E.2d 1163, 1169 (Ind.Ct.App.1992), *aff'd in part and rev'd in part*, 605 N.E.2d 755 (Ind.1993).

We first point out Hite's repeated erroneous references to Nancy as Judge Huffer's cousin. Nancy is Judge Huffer's cousin's widow. As such, Nancy was only related to Judge Huffer by marriage, a

---

8. See the section regarding disqualification, recusal, or mistrial for a more detailed explanation of their alleged familial relationship.

marriage that terminated upon the death of Judge Huffer's cousin.

Nancy's involvement in this case was at most tangential. She was neither listed as a witness nor did she testify. Rather, her name was mentioned outside of the jury's presence and only in reference to a matter to be forwarded to the prosecutor's office. Any contact between Judge Huffer and Nancy regarding this case is purely speculation. *Cf. Tyson v. State*, 622 N.E.2d 457 (Ind.1993) (holding that the Chief Justice properly disqualified himself where his wife discussed with defense counsel Tyson's approach to appeal); *Stivers v. Knox County Dep't of Pub. Welfare*, 482 N.E.2d 748 (Ind.Ct.App.1985) (reversing denial of change of venue where juvenile judge who ultimately presided over CHINS proceeding had previously sat in on several meetings discussing the couple's case and was thus privy to ex parte communications).

As for the rulings made against Hite, we cannot say these alone show bias. To the contrary, there were legitimate reasons for these discretionary rulings. For instance, although the trial court denied Hite's motion for a continuance after Cross's death, Hite had failed to support her motion. Moreover, the trial court ruled in Hite's favor on more than one occasion when faced with other discretionary motions. For example, the trial court granted Hite two extensions of time to respond to motions for summary judgment and granted her a continuance of the discovery deadline.

■ Under these circumstances, we conclude that Judge Huffer's impartiality can not reasonably be questioned. Hite has not overcome the presumption that

Judge Huffer was unbiased. Likewise, she has failed to show even the appearance of impropriety. Consequently, Judge Huffer did not err by failing to disclose his attenuated relationship with Nancy, by not recusing himself, or by denying the motion for mistrial.[9]

## II. Exclusion of Portion of Expert's Testimony

On August 31, 1998, the first morning of trial, Haase filed a supplemental motion in limine alleging, *inter alia*:

2. [Hite] initially served defendant's counsel with [her] Answers to Expert Interrogatories on July 7, 1998. In response to the inquiry regarding the names, addresses and specialty of all expert witnesses (including anticipated subject matter and opinions) [Hite] responded as follows: Each of the panel members in this case and [Stiver]. See Deposition testimony. (See Exhibit "A").

3. As [Stiver] has never been deposed in this case, [Hite's] answer to this expert Interrogatory provided absolutely no information about the subject matter or opinions of [Stiver's] anticipated testimony.

4 .... on August 24, 1998 (just six short days prior to trial) [Hite's] counsel, for the first time ever in this lawsuit, [supplemented Hite's response to the interrogatories] as follows:

[Stiver] will testify as to his involvement with the medical review panel formed in this cause. He will further testify as to the level of knowledge that an obstetrics and gynecology physician should have, as well as the

---

9. We briefly mention Hite's argument that defense counsel "had an obligation to take the relatively simple step of placing a telephone call to [Hite's] counsel once they realized that Nancy Huffer was the Judge's relative and had talked to Bruce Harter." Reply brief at 8. Because Hite first raises this issue in her reply brief, we will not address it. *See In re Estate of Whitehead*, 718 N.E.2d 1207, 1209 n. 1 (Ind.Ct.App.1999) ("because a reply brief only enables the appellant to respond to the appellee's brief, the appellant may not assert new issues herein."). Moreover, Hite cannot claim that the argument was not yet available when she filed her appellant's brief because the cases upon which she relies were published prior to her submission of her appellant's brief. *See Smith v. Johnston*, 711 N.E.2d 1259 (Ind.1999) and *In re Roberts*, 442 N.E.2d 986 (Ind.1983).

standard of care that such a physician should render. Further, [Stiver] will testify regarding tubal ligation procedures.

5. [Hite's] last minute disclosure of [Stiver's] anticipated expert opinions flies in the face of this Court's prior scheduling Order and the Indiana Rules of Trial Procedure regarding open discovery and timely responses.

6. If the Court permits [Stiver] to testify as anything other than a factual witness in this case, [Haase] will be unduly prejudiced because he was not given the opportunity to fully prepare for [Stiver's] testimony due to [Hite's] disclosure of his anticipated expert opinions just six (6) short days prior to trial.

Although the court restricted the scope of Stiver's testimony to matters given to the Medical Review Panel, an offer to prove reveals what his full testimony would have been:

Q. Would you state your opinions please regarding the care of Dr. Cross?

A. I find him deficient in two respects.

Q. And what are those?

A. The first is that he failed to diagnose a pregnancy when he should have. I base that opinion on the fact that this woman had a late menses cycle. She is of reproductive age. She was sexually active. She had a positive pregnancy test in April even though a lot of emphasis has been placed on the fact that she had a tubal ligation, the fact that she had a positive pregnancy test in April documented in Dr. Cross' records and performed in his office suggest to me this woman is now fertile. You showed me some ultrasound pictures that were performed in his office. I think the best guess on that ultrasound, not the video but the still pictures suggest there was a gestational sac on the ultrasound. He had every indication to suggest that there was a pregnancy there at the time he saw her in his office. And then to complicate matters he then gave her bad advice about the amount of radiation rads she received and [then] he gave her incorrect information about whether she should terminate her pregnancy or not.

On appeal, Hite contends that the court abused its discretion in excluding Stiver's probative testimony.

■ "Evidence is relevant if it has a tendency to prove a material fact." *Ford Motor Co. v. Ammerman*, 705 N.E.2d 539, 555 (Ind.Ct.App.1999), *trans. denied, cert. denied,* —— U.S. ——, 120 S.Ct. 1424, 146 L.Ed.2d 315 (2000). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Ind. Evidence Rule 403. "A trial court's decision to admit or exclude expert testimony is entrusted to the discretion of the trial court, and we will reverse only when the admission or exclusion is clearly erroneous and against the logic and effect of the facts and circumstances before the court." *Indianapolis Podiatry, P.C. v. Efroymson*, 720 N.E.2d 376, 383 (Ind.Ct.App.1999), *trans. denied.* "Erroneously excluded evidence requires reversal only if the error relates to a material matter or substantially affects the rights of the parties." *Id.*

■ Preliminarily, we note Hite's admission in her appellant's brief: "Dr. Stiver, as an OB/GYN, could only testify as to the standard of care for an OB/GYN. Thus, Dr. Stiver's testimony was only relevant as to Dr. Cross' care." That being the case, Hite cannot contend that she was prejudiced by the exclusion of Stiver's testimony in regards to her case against Haase. Hence, Hite's argument asserting improper exclusion of evidence relates only to her case against the Estate.

■ Hite does not adequately explain[10] why she did not request the origi-

10. She asserts with no citation that a "dispute arose between Plaintiff and Defendant Cross'

nal ultrasound video earlier, and, in turn, supplement the interrogatories in a more timely manner. On the other hand, the Estate and Haase, who knew that Stiver's name appeared on the witness lists, could have deposed him or asked for clarification if Hite's original interrogatory response to "See Deposition testimony" had truly confused them. In view of the fact that no party was blameless in this chain of events, the fairest resolution to Haase's motion to limit Stiver's testimony may have been to grant a continuance during which the defendants could depose Stiver. However, the trial court chose instead to grant the motion limiting Stiver's testimony. Assuming the evidence should not have been excluded, we examine whether the excluded evidence substantially affected Hite's rights.

At trial, a videotaped deposition of Deborah Allen, M.D. ("Allen"), chief of family practice at Indiana University Medical School, was shown. In the deposition, Allen opined that Cross's care was substandard for the following reasons:

> One is the fact that he is a specialist in obstetrics and gynecology and pregnancy is one of his diseases he should know very well. He also held a bit of information that the other doctors didn't which was that she had had a positive pregnancy test in that same year and that she had, therefore, been pregnant within the preceding several months and yet pregnancy never seemed to enter his mind as a cause of her illness.

She further stated that Cross should have diagnosed Hite's pregnancy on August 17, 1994, because "[a]t that time she had missed a period and she had an enlarged uterus." Allen also stated that Cross inac- curately informed Hite that the amount of radiation she had received would cause the child to be malformed, hence she should terminate the pregnancy.

Likewise, David Weaver, M.D. ("Weaver"), a geneticist and professor at Indiana University Medical Center, testified that in counseling pregnant women, he generally states "that if they have less than 5 or 10 rads of radiation that they have no increased risk" of birth defects to their fetus or embryo. He also noted the existence of the Teratogenic Hot Line at Indiana University Medical Center, a free service available to all physicians in Indiana should they have questions about the effects of diagnostic radiation on a fetus. After reviewing the radiation amount to which Hite was exposed, Weaver opined that the risk of birth defects after the radiation was the same as the risk of birth defects without the radiation. Weaver also testified that he would have approached Hite's situation by determining an accurate exposure, informing her of the risks, and letting her decide whether to continue the pregnancy. Weaver would not have recommended that Hite terminate the pregnancy. In sum, he stated, "I think Dr. Cross gave inaccurate information to [Hite] and I suspect because of that information she made a decision to terminate the pregnancy."

Mark Ormson, M.D., ("Ormson") a radiologist who served on the Panel in this case, testified to the Panel's conclusion that Cross breached the applicable standard of care by recommending a "therapeutic abortion in someone with less than 5 rads." He also stated that it was significant that "someone who had a tubal liga-

---

counsel, regarding the release of the original ultrasound films. [Cross's counsel, Edward] Chapleau still refused to release the original ultrasound films to Plaintiff. Plaintiff finally contacted the Court for assistance. The Court ordered Mr. Chapleau to release the films for one (1) day." Appellant's brief at 26. Cross responds: "[Hite] states that the court ordered counsel to release the ultrasound. This is a misstatement because the court never issued such an Order. Defendant's counsel agreed to release the original films to Plaintiff's counsel several days prior to trial on the provision they would be returned in a timely manner. This agreement was approved by the court. These ultrasounds could have been requested at any time during the past three and one-half years prior to trial. There were no requests for the films until one week prior to the trial." Cross's brief at 16–17.

tion many years ago if they have a positive pregnancy test – if it was a true positive ... it would make you think that she is capable of potentially being pregnant again." Ormson explained that the Panel, which consisted of two radiologists and an internist, consulted with Stiver in order to learn whether an obstetrician-gynecologist should have known that 5 rads would not have increased the risk of birth defects.

Stiver testified regarding the "5 rad rule," a "well accepted notion that pregnancies that are exposed to less than 5 rads ... of radiation ... there is no reason to suggest a woman terminate a pregnancy." He also testified that if he were presented with a pregnant woman who had been exposed to radiation, he would "speak to the radiologist and most likely have the radiologist contact a radiation physicist who would do the actual calculation." Had he been permitted to testify in full, Stiver would have opined that Cross was deficient in two respects: (1) failing to diagnose the pregnancy earlier; and (2) rendering incorrect advice as to the propriety of termination in view of the number of rads to which Hite was exposed. As outlined above, Allen, Weaver, Ormson, and Stiver himself testified to that same information. Hence, the majority of Stiver's excluded testimony would have been cumulative. "[T]he exclusion of cumulative testimony is not error[.]" *Simon v. Clark*, 660 N.E.2d 634, 637 (Ind.Ct.App.1996), *trans. denied* ; *see also Ford*, 705 N.E.2d at 555 (concluding no reversible error where excluded evidence was "merely cumulative").

We are unconvinced by Hite's assertion that such information would have been more persuasive emanating from a doctor of obstetrics and gynecology. The Panel relied on Stiver's expertise to reach their conclusion, and Ormson testified regarding their conclusion. Thus, the jury essentially heard the view of an obstetrician-gynecologist. Moreover, the speculative excluded testimony that the "best guess on that ultrasound ... suggest[s] there was a gestational sac," was essentially a reit-

eration of the opinion that Cross should have diagnosed the pregnancy earlier. Again, such expert evidence had already been admitted.

Accordingly, Hite has not shown that the exclusion of the cumulative evidence substantially affected her case. Without a demonstration of such prejudice, we will not reverse the trial court's decision excluding the evidence.

### III. Striking of Interrogatories

 The chronological case summary provides that on March 6, 1998, the trial court "set as a discovery cut off date June 30, 1998." On June 22, 1998, Hite filed a motion to extend the discovery deadline. On June 26, 1998, after a hearing, the trial court "continued" the discovery deadline to July 31, 1998. On July 30, 1998, Hite served the following interrogatories upon the defendants:

1) For each person identified in your list of witnesses filed with the Court herein, please state the following:

(a) The exact name and residence address of each such person;

(b) The exact business address of such person; and

(c) The substance of the testimony which you expect to elicit from each such person.

2) For each person identified on your list of witnesses from whom you intend to elicit expert opinion or testimony, please state with particularity the following:

(a) The subject matter on which the expert is expected to testify;

(b) Each opinion you expect the witness to testify about.

(c) The substance of the facts and opinions upon which the expert is expected to testify; and

(d) A summary of the grounds for each opinion held by such expert.

On August 5, 1998, Haase filed a motion to strike Hite's interrogatories, which the tri-

al court granted at the pre-trial conference two days later. On appeal, Hite asserts that the trial court abused its discretion in striking the interrogatories "without good cause." She claims that as a result she was "unable to determine that the Defendants intended to call Bruce Harter, and the substance of Bruce Harter's telephone conversation with Nancy Huffer in Dr. Haase's office, and Bruce Harter's telephone conference with Dr. Cross' office."

The discovery rules are designed to allow a liberal discovery process, the purposes of which are to provide parties with information essential to litigation of the issues, to eliminate surprise, and to promote settlement. Due to the fact-sensitive nature of discovery matters, the ruling of the trial court is cloaked in a strong presumption of correctness on appeal. Our standard of review in discovery matters is limited to determining whether the trial court abused its discretion. This court will reverse only where the trial court has reached an erroneous conclusion which is clearly against the logic and effect of the facts of the case. There will be no reversal of a trial court discovery order without a showing of prejudice.

*National Eng'g & Contracting Co., Inc. v. C & P Eng'g & Mfg. Co., Inc.,* 676 N.E.2d 372, 375 (Ind.Ct.App.1997) (citations omitted).

 Harter was the man by whom Hite became pregnant, was present when the pregnancy was diagnosed, and was with Hite when she had the pregnancy terminated.[11] As such, Hite knew of his importance to her case and planned to call him as a witness. Haase filed his witness list, naming Harter, on June 16, 1998. The following day; the Estate filed its list, which also named Harter. Thus, as of mid-June at the latest, Hite could not have been surprised that Harter was going to testify. Had she filed her interrogatories at that time, the defendants certainly could have completed them prior to the discovery deadline.[12] Yet, Hite filed her interrogatories just one day prior to the already extended discovery deadline, therefore imposing a response deadline around the time of trial (thirty-three days later). The trial court granted the motion to strike the interrogatories because they were "late filed." That is, Hite's filing of the interrogatories at such a late date caused them to arrive after the discovery deadline, thus preventing the completion of discovery by the cut-off date. We cannot say the court's conclusion was clearly against the logic and effect of the facts of the case.[13]

We cannot say the trial court abused its discretion in granting the motion to strike. *See Radio Distributing Co., Inc. v. National Bank and Trust Co. of South Bend,* 489 N.E.2d 642, 647 (Ind.Ct.App.1986) ("That is, after all, what the principle of discretion is about, viz. situations where there is no 'official' right answer and the court is afforded latitude for reasonable action."); *see also Chustak v. Northern Ind. Pub. Serv. Co.,* 259 Ind. 390, 397, 288 N.E.2d 149, 154 (1972) ("A party may not wait until the last possible moment to act, then rely upon the discovery rules and

---

11. Following the termination of the pregnancy, Hite again became pregnant by Harter. For unrelated reasons, Hite received a therapeutic abortion of the subsequent fetus as well.

12. We disagree with Hite's characterization of the interrogatories as being neither involved nor particularly time-consuming. *See* Reply brief at 11 ("The interrogatories would have taken fifteen (15) minutes for the Defendant to answer them.") The interrogatories had multiple parts and the defendants had listed several witnesses. Hence, answering them properly could have taken a considerable amount of time.

13. Furthermore, Hite has not demonstrated prejudice since Harter's testimony supported her. As for Hite's assertion that because of the striking of the interrogatories, she did not learn about Nancy's relationship to Judge Huffer until Harter testified, we have already concluded that this "relationship" did not affect the outcome.

expect the court to halt its proceedings in order to accommodate his motion.").

## IV. Partial Judgment on the Evidence

At the conclusion of Hite's case, Haase and HCIM moved for partial judgment on the evidence, arguing that the abortion performed on Hite was not a reasonably foreseeable natural and probable consequence of Haase's alleged negligence. Specifically, Haase argued that "based on the testimony of Hite's expert witnesses that given the low level of radiation to which she was exposed as a result of the tests ordered by Dr. Haase, that no reasonable physician would [have] recommend[ed] to his patient a therapeutic abortion, the recommendation of a therapeutic abortion by Dr. Cross was an intervening, superseding cause of the alleged injury to Hite that was not reasonably a foreseeable result of Dr. Haase's actions." Haase's brief at 25. The trial court granted Haase's motion "to the extent that damages [were] limited to the physical pain and mental suffering experienced, reasonable expense of necessary medical care, treatment and services, and the value of lost earnings and lost – or impairment of earning capacity during hospitalization." On appeal, Hite contends that the trial court erred in granting partial judgment on the evidence.

 Indiana Trial Rule 50, which governs judgment on the evidence, provides in relevant part:

Where all or some of the issues in the case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon notwithstanding the verdict.

Ind. Trial Rule 50(A).

Upon review of a motion for judgment on the evidence, we consider the evidence most favorable to the nonmoving party along with all reasonable inferences to be drawn therefrom. Judgment on the evidence should be denied unless there is a total absence of evidence or reasonable inference on at least one essential element of a plaintiff's case. As long as there is probative evidence or a reasonable inference to be drawn from the evidence presented or if reasonable people would differ as to the result, judgment on the evidence is improper. A motion for judgment on the evidence should be granted only in those cases where the evidence does not conflict, is susceptible to only one inference, and supports judgment for the movant. *Gold v. Ishak*, 720 N.E.2d 1175, 1180 (Ind. Ct.App.1999) (citations omitted), *trans. pending.*

 Hite asserts without any citation that it is *not* common for obstetricians to be confronted with pregnant patients who have received several rads of diagnostic radiation. Citing *Edwards v. Sisler*, 691 N.E.2d 1252, 1253 (Ind.Ct.App.1998), and *Whitaker v. Kruse*, 495 N.E.2d 223, 225 (Ind.Ct.App.1986), Hite argues:

Because of the unusual circumstances, it is foreseeable that a doctor may not possess the knowledge to properly advise the patient in such a situation. Dr. Cross' counsel argued that Dr. Cross acted reasonably and was not negligent in recommending termination to Ms. Hite. Thus, one inference that could be drawn from the evidence is that it was foreseeable that a doctor, such as Dr. Cross, would advise Ms. Hite to have a therapeutic abortion due to the radiation. Had Dr. Haase not created the situation by giving Ms. Hite radiation while pregnant, Dr. Cross would not have been confronted with the situation. Clearly, Dr. Haase was a proximate, not a remote cause, of the termination of Ms. Hite's pregnancy.

Hite's appellant's brief at 35. Although Hite's experts testified that no reasonable physician would have recommended a therapeutic abortion based solely on the low level of exposure to radiation sustained by

Hite, a defense expert opined otherwise. Hence, the jury could have inferred, if it had believed the defense expert over Hite's experts on that issue, that it was foreseeable for a doctor to have made the erroneous advisement. Thus, the judgment on the evidence would seem to have been granted in error. We next examine whether the error was reversible.

The court's final instruction number 23 reads:

If you find for Sherri Hite on the question of liability, you then must determine the amount of money that will fairly compensate Sherri Hite for those elements of damage that were proved by the evidence to have resulted from the negligence of Defendant, [Haase]. You may consider:

1. The physical pain and mental suffering experienced;

2. The reasonable expense of necessary medical care, treatment, and services; and

3. The value of lost earnings during hospitalizations prior to September 9, 1994.

You are to determine whether these elements of damage have been proved by a preponderance of the evidence relating to damages. Your verdict must be based on that evidence and not on guess or speculation.

The court's final instruction number 25 reads:

There are four (4) verdicts you should consider in this case: Verdict A, Verdict B, Verdict C, Verdict D.

If you find for Plaintiff, Sherri Hite, as against Defendants, [Haase and HCIM], you should use Verdict A, and assess Plaintiff's damages against [Haase and HCIM].

If you find for Defendants, [Haase and HCIM], you should use Verdict B.

Instruction number 25 contained identical language regarding the Estate and CGI. Verdict form A provided:

We, the jury, find for the Plaintiff, Sherri Hite, and against the Defendants, [Haase and HCIM], and assess damages for Plaintiff, Sherri Hite, against Defendants, [Haase and HCIM], in the amount of $_____.

Verdict form B provided:

We, the jury, find for the following Defendants, [Haase and HCIM], and against the Plaintiff, Sherri Hite.

Verdict form C was identical to A except that the Estate and CGI were inserted in place of Haase and HCIM. Likewise, Verdict Form D was identical to B except that the Estate and CGI were inserted in place of Haase and HCIM.

The jury signed and dated Verdict forms B and D, thereby indicating that it had found in favor of the physicians, rather than in favor of Hite. Since the jury did not find Haase liable, no damages were assessed. Therefore, the trial court's granting of the partial judgment on the evidence limiting the amount of damages to be awarded had no effect on the case's outcome. Accordingly, Hite has not shown reversible error.

Affirmed.

DARDEN, J., and MATTINGLY, J. concur.